No. 28,630.

OTIS S. ALLEN, *Appellee*, v. THE DERBY OIL COMPANY, *Appellant*.

(276 Pac. 53.)

Opinion filed April 6, 1929.

*Charles G. Yankey, John L. Gleason* and *Kenneth K. Cox*, all of Wichita, for the appellant.

*Robert C. Foulston, George Siefkin, Sidney L. Foulston* and *Lester L. Morris*, all of Wichita, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action upon a contract defining the rights and liabilities of these litigants on a matter relating to the rehabilitation and completion of an oil well upon which operation had been suspended.

The plaintiff, Allen, owned an oil-and-gas lease on eighty acres in Butler county. In 1922 he had drilled a prospect hole thereon to a depth of 2,744 feet and had encased it with 2,340 feet of 8¼-inch pipe and 2,744 feet of 6⅝-inch pipe. Following this he suspended drilling operations until May 12, 1926, at which time he entered

into a contract with defendant, the Derby Oil Company, whereby the latter undertook to drill this prospect hole to a greater depth in the hope that it might turn out to be a commercial producer. By the terms of the contract Allen agreed to assign to defendant a three-fourths working interest in the lease and gave it the use of the casing already in the well. Defendant agreed to continue the drilling at its own expense and to furnish all necessary equipment to handle the well if it should turn out to be a producer. Other terms of the contract provided:

"Second party [defendant] further agrees, if said well be a dry hole, to pull the 8¼-inch and 6⅝-inch casing aforementioned, or so much thereof as can be pulled, and deliver the same on top of the ground at the well to the party of the first part [Allen] free of cost to first party, and it is understood and agreed that all equipment, material and supplies furnished by second party shall be and remain the property of the second party.

"It is further agreed that if said well is completed as a commercial well, *second party will purchase from first party on completion thereof an undivided three-fourths interest in said 8¼- and 6⅝-inch casing and pay therefor, in cash,* the present market price of similar casing on top of the ground at said location. And first party agrees to purchase from second party an undivided one-fourth interest in the derrick, additional casing, tanks, engine, tubing and pump and all other equipment, material and supplies necessary for producing and saving the oil and gas from said well and to bear his proportionate part of the cost of operating the same, but to pay therefor only out of his part of the proceeds of the oil or gas marketed from said well, and agrees that his portion of said proceeds shall be paid by the purchaser of the oil or gas to second party until the amount payable for said equipment, material and supplies is fully paid, second party to render to first party a full itemized statement of said equipment, material and supplies as soon as practicable after the completion of said well, and to furnish first party, for his inspection, the statement of the pipe-line runs from said well."

Pursuant to this contract defendant promptly set to work, and in a few weeks it had drilled the prospect hole down to 3,187 feet, at which level a vein of oil was struck which yielded a few barrels of oil per day, and which continued that yield for nearly two years and had not ceased to do so when this record was made up.

It appears that defendant put a pump on the well, sold the oil and kept the proceeds, but failed to account to plaintiff therefor or to perform any of its obligations toward him as defined in the excerpts of their contract quoted above. Hence this lawsuit.

Issues were joined as to whether the well was a commercial well, whether defendant's course of dealing with the well and disregard of plaintiff's contract rights would permit it to deny that it was a

commercial well, whether there was a subsequent agreement between the parties which excused defendant from performing its contract duty toward plaintiff if the well were to be regarded as a dry hole, and whether defendant was bound to buy and pay for plaintiff's pipe according to the terms of the contract.

Jury trial; special findings and general verdict for $3,574.76 in favor of plaintiff; and judgment accordingly.

Defendant assigns and argues certain errors, contending first that the trial court erred in its instructions to the jury that a recovery could be had by plaintiff even though the well was not a commercial well. The evidence showed that defendant dealt with the well as if it were a commercial producer. It installed a pump, erected storage tanks, connected it with an oil-buying pipe-line company, procured from plaintiff an assignment of his proportionate share of the oil runs and collected and pocketed the proceeds of oil sales—an average of 175 barrels or more every two weeks, yielding from $200 to $400 or more, and an aggregate of 6,302.48 barrels, worth $9,-538.28 in 1 year, 8 months and 15 days. At the end of the first eight and one-half months it had realized over $6,000, when, according to a letter from defendant dated May 26, 1927, in response to one of plaintiff's repeated demands for an accounting, "the expense of operating the well was almost $5,000." A probative circumstance inhered in the fact that if the well turned out to be an unproductive "dry hole" defendant's contract obligation required it to pull the casing and deliver it to plaintiff on the ground and free of cost to him. Since that was never done and was only to be excused if a commercial well were completed, the probative significance of the defendant's failure to pull and deliver the casing could not be ignored by the tribunal which was authorized to solve this disputed issue of fact. The contract provided that under alternative conditions defendant should buy a three-fourths interest in plaintiff's casing pipe or pull that pipe and deliver it to plaintiff piled on the ground. If it were a commercial well it would buy; if not, it would pull. It declined to do either. A time comes when people who bind themselves in such a contract must perform in some fashion—when they must either fish or cut bait, and the criticism of the trial court's instructions cannot be sustained.

It is contended, however, that the continued operation of the well notwithstanding its supposedly unprofitable character was pur-

suant to an agreement that the well should be pumped so as to keep the lease in force while other prospect holes were being drilled in the vicinity. The only agreement to that effect was that defendant's vice president told Allen the well ought to be kept in operation until some neighboring prospect holes were completed, and Allen said that nothing would be done until after the neighboring "Shriver" and "Rosenthal" wells were completed. The "Shriver" well was completed as a producer in October, 1927. The "Rosenthal" proved to be a dry hole. Defendant's vice president testified:

"Q. You claim you were holding this casing until such time, until the Rosenthal well and the Shriver well was completed so you could ascertain whether you wanted to continue? A. Yes.

"Q. Yet up to this date you have not offered to pull the casing or pay him for it, either one? A. No, because he brought this suit."

Allen's consent to the proposal of defendant that nothing should be done until the result of these neighboring prospect holes was ascertained merely deferred but did not waive his contract right to have defendant "buy or pull" the pipe in the Allen well.

Fault is found with the jury's answer to this question:

"After the well was put on the pump and before the commencement of this action, did the Derby Oil Company, through its officers and agents, suggest to the plaintiff that this well was not a commercial producer, but that in order to keep the lease alive so that in the event other production and development in the vicinity of the lease might tend to give the lease a greater value, they should continue to pump the well, even though it was not a commercial producer, until such time as these various wells were drilled and tested? A. No."

It is contended that this question should have been answered in the affirmative. But even so, it would not have compelled a different general verdict nor a different judgment than those rendered in the action. The period during which the well was to be kept on the pump, whether to do so was profitable or not, had terminated some two months before this action was begun. It was no part of the agreement that plaintiff should never be paid for his pipe nor have it pulled and delivered to him merely because of his assent to have the well kept on the pump until the neighboring prospect holes were completed. In May, 1927, defendant wrote to plaintiff saying that the result of the Shriver well would determine the outcome of the Allen well. When the Shriver well was completed and placed on the pump in October, 1927, it was time for defendant to elect whether it would treat the Allen well as a producer and buy three-fourths of the pipe from Allen or consider it a dry hole and pull the

pipe and deliver it to him; and the jury's special finding of fact, although justly subject to criticism, cannot affect this judgment.

The record discloses no error, and the judgment is affirmed.